**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **(1)  STATE OF OKLAHOMA**<br>**ex rel. E. SCOTT PRUITT,**<br>**in his official capacity as Attorney**<br>**General of Oklahoma,**<br><br>        **Plaintiff,**<br><br>**v.**<br><br>**(1)  UNITED STATES**<br>**ENVIRONMENTAL PROTECTION**<br>**AGENCY,**<br><br>**(2)  UNITED STATES ARMY CORPS**<br>**OF ENGINEERS,**<br><br>**(3)  GINA MCCARTHY, in her official**<br>**capacity as Administrator of the**<br>**U.S. Environmental Protection Agency,**<br><br>**and**<br><br>**(4)  JO-ELLEN DARCY, in her official**<br>**capacity as Assistant Secretary of the**<br>**Army for Civil Works,**<br><br>        **Defendants.** | **Case No. 15-CV-381-CVE-FHM** |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### Introduction

1.        The State of Oklahoma challenges a final agency rulemaking that unlawfully expands federal jurisdiction under the Clean Water Act. This regulation usurps the State's authority over its land and water use, and triggers numerous and costly obligations under the Act for the State and its citizens. This expansion of federal authority is in direct conflict with the Clean Water Act, exceeds the federal government's authority under the Commerce Clause, and violates the Administrative

Procedure Act. Plaintiff therefore seeks an order vacating the final rule and enjoining its enforcement.

2.      The Clean Water Act ("CWA" or "Act") grants the federal government control over only "navigable waters," meaning "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362. Due to this limited grant of federal authority, courts have previously rejected attempts by the federal government to deprive States of their sovereign authority through broad definitions of "waters of the United States." *See Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers* (*SWANCC*), 531 U.S. 159 (2001); *Rapanos v. United States*, 547 U.S. 715 (2006).

3.      Similar to past agency actions vacated by the Supreme Court, the *Clean Water Rule: Definition of "Waters of the United States"* ("the Final Rule") once again unlawfully broadens the definition of "waters of the United States" by including many small streams and ditches, ponds, creeks, wetlands, any waters adjacent to those waters, and waters that are believed to exist within the 100-year floodplain of a stream or within 4,000 feet of the high tide line or high water mark of a stream. In attempting to regulate these traditionally state-regulated waters the Agencies have deprived the States of their inherent authority to regulate those waters. Further, because many of these waters were not previously regulated by the federal government, the new definition triggers obligations for the States that did not previously exist for those waters—even though those waters are far removed from any traditional "water of the United States."

4.      For many of the same reasons, the Final Rule harms landowners, homeowners, farmers, and developers. It subjects them to new obligations under the Clean Water Act including forcing them to participate in an often lengthy and costly permitting process before they can continue to engage in lawful activities on their private land, and introduces uncertainty regarding which of the waters on their land now fall under federal jurisdiction.

5.     For these reasons, the State of Oklahoma brings this action against the EPA and the Corps seeking a declaration that the Final Rule is unlawful, and seeking preliminary and permanent injunctive relief barring the Agencies from giving the Final Rule effect.

## Parties

6.     The State of Oklahoma is a State of the United States of America with all rights, powers, and immunities of a State under the United States Constitution, including the sovereign power over land, water, and natural resources within its jurisdiction as well as the power to create and enforce legal codes, statutes, and constitutional provisions.

7.     E. Scott Pruitt, in his official capacity as the Oklahoma Attorney General, brings this action on behalf of the State of Oklahoma as the chief law officer for the State of Oklahoma. In that capacity, he has a statutory duty to prosecute and defend all actions and proceedings in any federal court in which the State is interested as a party. 74 O.S. § 18b(A)(1). The State of Oklahoma has an interest in asserting the invalidity of the Final Rule because it impairs (1) the ability of the State to implement its own water quality laws; (2) the ability of the State to make full use of its own waters; and (3) the State's rights under both the state and federal constitutions, the Clean Water Act, and common law.

8.     The United States Environmental Protection Agency is an agency charged with implementing many portions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* ("Clean Water Act").

9.     The United States Army Corps of Engineers is a federal agency within the Department of Defense. The Assistant Secretary of the Army for Civil Works has delegated responsibility for implementing portions of the Clean Water Act.

10.     Gina McCarthy, in her official capacity as Administrator of the U.S. Environmental Protection Agency, is responsible for administering and enforcing the Final Rule.

11.     Jo-Ellen Darcy, in her official capacity as Assistant Secretary of the Army for Civil Works, is responsible for administering and enforcing the Final Rule.

### Jurisdiction and Venue

12.     This Court has federal question jurisdiction under 28 U.S.C. § 1331, and is authorized to enter a declaratory judgment pursuant to 28 U.S.C. § 2201 and 5 U.S.C. § 706. This Court has power to grant injunctive relief pursuant to 28 U.S.C. § 2202.

13.     While the Final Rule does not fall within one of the enumerated provisions of 33 U.S.C. § 1369(b) and is thus not subject to direct judicial review in the Circuit Court of Appeals, Plaintiff has filed a Petition for Review with the United States Court of Appeals for the Tenth Circuit out of an abundance of caution. *See Am. Paper Inst. v. EPA,* 882 F.2d 287, 288 (7th Cir. 1989).

14.     Venue is proper under 28 U.S.C. § 1391(e)(1).

### Facts

## I.      Regulation under the Clean Water Act

15.     The CWA "recognize[s], preserve[s], and protect[s] the primary responsibilities and rights of States . . . to plan the development and use . . . of land and water resources." 33 U.S.C. § 1251(b). Thus, that Act leaves to the States their sovereign authority over non-navigable, intrastate waters.

16.     The CWA grants federal agencies the limited authority to regulate "navigable waters," meaning "waters of the United States, including territorial seas." 33 U.S.C. § 1362(7).

17.     Designation of a water as a "water of the United States" triggers a myriad of State requirements and obligations under the CWA. For example, when a water is determined to be a "water of the United States," a State must establish certain water quality standards for that body of water. 33 U.S.C. §§ 1311(b)(1)(C), 1313(e)(3)(A). These standards must "define[] the water quality

goals of a water body . . . by designating the use or uses to be made of the water" and by "setting criteria necessary to protect the uses." 40 C.F.R. § 130.3.

18.     For all waters designated as "waters of the United States," States must also "establish appropriate monitoring methods and procedures" by compiling and analyzing data to ensure those water quality standards are being met. *Id.* A State must then review every discharge that is made into a "water of the United States" and certify that the discharge will comply with the State's water quality standards. 33 U.S.C. § 1341. The State also must issue a permit pursuant to the CWA's National Pollutant Discharge Elimination System program before that individual or entity can begin discharging into the water. *Id.* §§ 1311(a), 1341, 1342, 1362(12). "Waters of the United States" that fail to meet the State's water quality standards must be listed as "impaired waters." States must prioritize each of the impaired waters and then restrict the maximum amount of pollutant allowed to enter the water by setting a "total maximum daily load" for that water. 33 U.S.C. § 1313(d)(1)(C); 40 C.F.R. § 130.7.

19.     Finally, States must submit a detailed biennial report containing (1) a description of the water quality of all navigable waters in the State, (2) an analysis of the extent to which the navigable waters provide protection and propagation of certain animal populations, (3) an analysis of how the elimination of pollutant discharges have been or will be achieved, (4) an estimate of environmental impact and economic and social costs of achieving the Act's objectives, and (5) a description of the nature and extent of nonpoint sources of pollutants and accompanying recommendations to control such sources. 33 U.S.C. § 1315(b).

## II.     The Agencies' past attempts to expand federal jurisdiction over state waters.

20.     The Agencies have made two attempts to expand federal jurisdiction over traditionally state-regulated waters. The United States Supreme Court has rejected both attempts.

21.     In 1986, the federal government asserted jurisdiction over intrastate waters "which are or would be used as habitat" by either migratory birds that cross state lines or endangered species. *E.g., Final Rule for Regulatory Programs of the Corps of* Engineers, 51 Fed. Reg. 41,206, 41,217 (Nov. 13, 1986). Known as the "Migratory Bird Rule," this rule would have allowed the federal government to regulate completely intrastate waters, extending federal jurisdiction to even isolated, seasonal ponds.

22.     In evaluating the validity of that rule, the United States Supreme Court recognized that "Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority." *SWANCC*, 531 U.S. at 172-73. The Court noted that this is especially true where "the administrative interpretation alters the federal-state framework by permitting federal encroachment upon a traditional state power." *Id.* (quoting *United States v. Bass*, 404 U.S. 336 (1971)).

23.     The Court then found that the "'Migratory Bird Rule' would result in a significant impingement of the States' traditional and primary power over land and water use." *Id.* at 174. Because Congress gave no clear statement that it intended to allow federal jurisdiction "over ponds and mudflats," the Court concluded that it must read the statute to avoid the "significant constitutional and federalism questions raised by [the federal government's] interpretation." *Id.*

24.     In 2006, the Supreme Court was confronted again with an attempt to broaden the definition of "waters of the United States." In *Rapanos*, the Supreme Court considered whether non-navigable tributaries of traditional navigable waters are within the Agencies' jurisdiction. 547 U.S. at 739-742.

25.     In a plurality opinion authored by Justice Scalia, the Court rejected the "expansive theory advanced by the Corps . . ." which "would have brought virtually all 'plan[ning of] the

development and use . . . of land and water resources' by the States under federal control" rather than "preserv[ing] the primary rights and responsibilities of the States." *Rapanos*, 547 U.S. at 737.

26.     The plurality defined "waters of the United States" to "include only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams, . . . oceans, rivers, [and] lakes." *Id.* at 739. Wetlands that have only "an intermittent, physically remote hydrologic connection" to those waters do not fall within federal jurisdiction. *Id.* at 742.

27.     In a concurring opinion, Justice Kennedy similarly rejected the government's "waters of the United States" definition. In Justice Kennedy's view, a water "come[s] within the statutory phrase 'navigable waters' if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.* at 780 (Kennedy, J., concurring). The federal government's approach was invalid, he reasoned, because it "permit[ed] federal regulation whenever wetlands lie alongside a ditch or drain, however remote and insubstantial, that eventually may flow into traditional navigable waters." *Id.*

28.     A little over two years after *Rapanos*, the Agencies published guidance explaining their approach to whether waters constitute "waters of the United States." *See* EPA & Corps, *Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in* Rapanos v. United States *&* Carabell v. United States (Dec. 2, 2008), *available at* 1.usa.gov/1Qz2hiv.

29.     Under the 2008 guidance, the Agencies asserted jurisdiction over all waters that would traditionally be navigable waters as well as wetlands adjacent to those waters. *Id.* Further, the Agencies asserted jurisdiction over all non-navigable tributaries of navigable waters where the tributaries have year-round flow or continuous flow seasonally. *Id.* They also asserted jurisdiction over all wetlands directly abutting such non-navigable tributaries. *Id.*

7

30.     The Agencies stated that they would adopt Justice Kennedy's "significant nexus" test. Thus, non-navigable tributaries that flow only intermittently or ephemerally along with wetlands adjacent to them and wetlands that are adjacent but do not directly connect to permanent navigable tributaries would be covered if they, either alone or in combination with similarly situated waters in the region, have a significantly affect the chemical, physical, and biological integrity of other covered waters. *Id.*

**III.     The new and expanded definition of "waters of the United States."**

31.     On June 29, 2015, the Agencies promulgated a new "waters of the United States" definition. *See* 40 C.F.R. § 230.3 (2015). The purpose and effect of the Final Rule is to broaden the definition of "waters of the United States" so that waters currently subject to regulation only by the States are now subject to regulation by federal agencies.

32.     The Agencies define "waters of the United States" to include the following as "primary waters": waters used in interstate commerce, including all waters which are subject to the ebb and flow of the tide; all interstate waters, including interstate wetlands; and the territorial seas. Also included as *per se* "waters of the United States" are impoundments and tributaries. 40 C.F.R. § 230.3(s)(1)(iv)-(v). Each of these categories of waters existed under the former definition. In addition to these categories, however, the Agencies have notably added two new categories of waters to this list, and have defined "tributaries" in a way that vastly expands federal jurisdiction over streams that are dry for most of the year.

**A.     The Final Rule's coverage of "all adjacent waters" violates the Administrative Procedure Act and the United States Constitution.**

33.     The first new category under the Final Rule is "[a]ll waters adjacent" to primary waters, impoundments, and tributaries. *Id.* § 230.3(s)(1)(vi). The Rule goes on to specifically list all adjacent "wetlands, ponds, lakes, oxbows, impoundments, and similar waters[.]" *Id.*

34. "Adjacent" is defined broadly to mean any waters "bordering, contiguous, or neighboring a [primary water, impoundment, or tributary] . . . including waters separated by constructed dikes or barriers, natural river berms, beach dunes, and the like." *Id.* § 230.3(s)(3)(i). Adjacent waters further include "waters that connect segments of [primary waters, impoundments, or tributaries] or are located at the head of a [primary water, impoundment or tributary] . . . and are bordering, contiguous, or neighboring such water." *Id.* The Agencies define "neighboring" as those waters located within 100 feet of the ordinary high water mark of a primary water, impoundment, or tributary, or waters within a 100-year floodplain and within 1,500 feet of the ordinary high water mark of a primary water, impoundment or tributary. *Id.* § 230.3(s)(3)(ii). By contrast, the *Rapanos* plurality described "adjacent" wetlands as "only those wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands." *Rapanos*, 547 U.S. at 742.

35. This means that, under the Final Rule, a water can be considered an adjacent water *even if* that water is physically separated from a primary water, impoundment, or tributary, and *even if* that water has no effect on a primary water, impoundment, or tributary. The addition of this category is thus improper because it extends *per se* jurisdiction to a large variety of waters within floodplains, including lands that are dry most of the year, merely because they are near a primary water, impoundment, or tributary. It thus cannot be said that such a water is "relatively permanent, standing or continuously flowing," and has a "continuous surface connection" to navigable waters as the *Rapanos* plurality required.

36. For the same reasons, expansion of federal jurisdiction to all adjacent waters violates Justice Kennedy's significant nexus approach. This is so because the definition sweeps in all waters adjacent to a primary water impoundment or tributary; all waters within 100 feet of a primary water, impoundment or tributary; and all waters within the 100-year floodplain and within 1,500 feet of the

ordinary high water mark of a primary water, impoundment, or tributary, even when there is no "significant nexus" to that primary water, impoundment, or tributary.

**B.    The Final Rule's coverage of intrastate, non-navigable waters based on a case-by-case analysis violates the Administrative Procedure Act and the Constitution.**

37.    The second new category listed in the Final Rule involves a case-by-case determination of authority over certain waters not already set out in the Final Rule. "Waters of the United States" now includes all waters located even partially within the 100-year floodplain of a primary water or partially within 4,000 feet of the high tide line or ordinary high water mark of a primary water, impoundment, or tributary when those waters have a "significant nexus" to a primary water. 40 C.F.R. § 230.3(s)(1)(viii).

38.    According to the Final Rule, a significant nexus exists when "a water, including wetlands, either alone or in combination with other similarly situated waters in the region, significantly affects the chemical, physical, or biological integrity of a [primary] water." *Id.* § 230.3(s)(3)(v). Waters "in the region" means the watershed that drains to the nearest primary water. *Id.* In determining whether a water has a significant nexus to a primary water, the water's effect on the downstream primary water will be assessed by evaluating certain aquatic functions listed in the Final Rule. *Id.* Some of these aquatic functions include sediment trapping, pollutant trapping, retention of floodwaters, and runoff storage. *Id.* § 230.3(s)(3)(v)(A)-(I).

39.    This case-by-case approach violates both *Rapanos* tests. Coverage over "similarly situated waters" that would "significantly affect[] the chemical, physical, or biological integrity" of a primary water sweeps in many intrastate waters that do not have a "continuous surface connection" to a primary water. *See Rapanos*, 547 U.S. at 742. Additionally, this approach does not accord with Justice Kennedy's views. The Final Rule requires an effect on the "chemical, physical, *or* biological integrity" whereas Justice Kennedy required an effect on the "chemical, physical, *and* biological

10

integrity" of covered waters. The Agencies also intend to apply that "significant nexus" test much more broadly than Justice Kennedy ever allowed in *Rapanos*—they would aggregate large numbers of waters as "similarly situated" and then counting the cumulative effect of such aggregations within an *entire watershed*, their interpretation of "region," so long as they have a small number of similar characteristics. 80 Fed. Reg. 37,063.

      40.    The breadth of the Final Rule's case-by-case approach brings it squarely into conflict with the Supreme Court's holding in *SWANCC*. According to the Final Rule, a significant nexus might occur between a small wetland not connected to a primary water so long as the wetland, *in combination with other wetlands in the entire watershed*, has a "biological effect" such as having "life cycle dependent aquatic habitat[s]" for animals that also live in a primary water. 40 C.F.R. § 230.3(s)(3)(v). In other words, wildlife with any connection to small wetlands in a watershed can make many small wetlands identified in the case-by-case provisions into jurisdictional waters despite their lack of connection to a primary water. That's exactly what the Supreme Court rejected when declared the Migratory Bird Rule invalid in *SWANCC*.

    **C.**    **The Final Rule's expanded definition of "tributary" violates the Administrative Procedure Act and the Constitution.**

      41.    The Final Rule not only expands federal authority over *per se* "waters of the United States" by specifically listing new types of waters, but it also broadly defines its terms—such as "tributary"—in a way that encompasses many traditionally state-regulated waters not previously covered.

      42.    The Final Rule defines a tributary as: "a water that contributes flow, either directly or through another water (including an impoundment . . .), to a [primary] water . . . that is characterized by the presence of the physical indicators of a bed and banks and an ordinary high water mark." 40 C.F.R. § 230.3(s)(3)(iii). Thus any water, as long as it has something that looks like a bed and banks

along with an ordinary high water mark and somewhere down the line has an attenuated connection to a primary water, can be considered a tributary.

43.     This definition of tributary gives the Agencies federal jurisdiction over ponds, ephemeral streams, and usually dry channels. It thus violates the *Rapanos* plurality's test because it allows federal jurisdiction over a water with *any* flow into a primary water, even if it does not have a "continuous surface connection." *Rapanos*, 547 U.S. at 742.

44.     This expanded coverage over tributaries similarly fails under Justice Kennedy's test because it allows the Agencies to regulate all tributaries despite the amount or duration of the flow of that water into a primary water. It thus places waters under federal jurisdiction without regard to the actual impact on the "chemical, physical, and biological integrity of" primary waters. *See id.* at 717.

## IV.    The Final Rule harms the State of Oklahoma and its citizens.

45.     As detailed above, the Final Rule's expansion of the "waters of the United States" definition to include many waters not previously regulated by the federal government imposes significant burdens on the States. Most notably, this expansion of federal jurisdiction deprives the States of their constitutional and statutorily-protected authority to "plan the development and use . . . of land and water resources." *See* 33 U.S.C. § 1251(b); *SWANCC*, 531 U.S. at 174.

46.     Expanding "waters of the United States" to include waters previously regulated by the States also triggers costly and time-consuming requirements and obligations under the CWA. For example, States must establish water quality standards for each "water of the United States" that sets the criteria necessary to protect the uses of that water. 33 U.S.C. § 1311(b)(1)(C); § 1313(e)(3)(A); 40 C.F.R. § 130.3. Thus the States will potentially have to reevaluate each of the waters within its territory to determine if they will fall within the Agencies' new definition.

47.     Once the States identify potential "waters of the United States," the States must establish monitoring programs to ensure those standards are being met. 40 C.F.R. § 130.4. Thus, the expanded definition increases the number of waters for which the States must "compile and analyze data." *See id.*

48.     Additional waters also means that the State will have to conduct more water quality assessments for the biennial water quality reports it must publish. *See* 33 U.S.C. § 1315(b). This too will result in higher costs to the State.

49.     States could also see an increase in the number of certifications it must grant—both for discharge permits and dredge-and-fill permits—along with the number of permits it must issue under the National Pollutant Discharge Elimination System program. *See* 33 U.S.C. §§ 1311, 1341, 1342, 1344, 1362(12). The process of obtaining a permit can take years and be very costly. Failure to acquire a permit before discharging a pollutant into a federally-regulated water subjects individuals and States to criminal or civil penalties, including fines of up to $37,500 per violation, per day. 33 U.S.C. §§ 1311, 1319, 1365; *see also* Civil Monetary Penalty Inflation Adjustment Rule, 74 Fed. Reg. 626, 627 (Jan. 7, 2009). States will therefore be expending greater resources in order to accept and process the new applications.

50.     Finally, for those waters that fail to meet water quality standards, States must establish total maximum daily loads that restrict the maximum amount of pollutant allowed to enter the water. 33 U.S.C. § 1313(d)(1)(C), 40 C.F.R. § 130.7.

51.     The Final Rule also harms the citizens of the States. Property owners, developers, energy producers, and farmers will be subject to the costly permitting requirements and fines noted above. Moreover, these citizens are now subject to a significant amount of regulatory uncertainty as to whether, for example, a usually dry creek bed near their property will require them to seek a certification and permitting under the CWA.

## COUNT I

### (The Final Rule Violates the Administrative Procedure Act)

52.    Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint.

53.    The Final Rule is final agency action for purposes of 5 U.S.C. § 706(2)(A).

54.    The Administrative Procedure Act requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

55.    The Final Rule is arbitrary and capricious, an abuse of discretion, and not in accordance with law because it expands the definition of "waters of the United States" to include waters only intermittently or not at all connected to primary waters.

56.    The Final Rule interprets "waters of the United States" to include "[a]ll waters adjacent to" primary waters, impoundments, and tributaries, which is defined to include waters within a "100-year floodplain" and within 1,500 feet of an ordinary high water mark. 40 C.F.R. § 230.3(s)(1)(vi), (3)(i)-(ii). A 100-year floodplain calculation is based on a 1% probability of a flood event occurring rather than an adequate ecological definition of floodplains that takes into account ecological connections between various waters. Definition of "Waters of the United States" Under the Clean Water Act, 79 Fed. Reg. 22,188, 22,236 (Apr. 21, 2014).

57.    The Agencies lack sufficient evidence to show that all waters included within a 100-year floodplain and within 1,500 feet of a high water mark would have a "continuous surface connection" rather than a "remote hydrologic connection" with a primary water. *Rapanos*, 547 U.S. at 742 (plurality opinion).

58.    Similarly, the Agencies lack sufficient evidence to show that all waters included within a 100-year floodplain and within 1,500 feet of a high water mark have a "significant nexus"

involving a "chemical, physical, and biological" relationship to primary waters. *Rapanos*, 547 U.S. at 780 (Kennedy, J., concurring).

59.     The Final Rule additionally includes "all tributaries," which are broadly defined to include waters that "contribute[] flow, either directly or through another water" to primary waters. 40 C.F.R. § 230.3(s)(1)(v), (3)(iii). The Agencies do not have sufficient evidence to show that "all tributaries," as defined in the Final Rule, have a "significant nexus" involving a "chemical, physical, and biological" relationship to primary waters.

60.     By broadening the definition of "waters of the United States" to "all impoundments" of any other recognized water of the United States, the Final Rule compounds the prior errors by sweeping in even more bodies of water without a basis for those waters having continuous surface connections with or having a significant nexus to primary waters.

61.     Finally, several definitions in the Final Rule require a showing of a "significant nexus" to certain waters. *E.g.*, 40 C.F.R. § 230.3(s)(1)(vii), (viii). But the Final Rule's version of "significant nexus" requires a notably lesser showing than the test articulated by Justice Kennedy in his concurrence in *Rapanos. Compare* 40 C.F.R. § 230.3(s)(3)(v) (defining "significant nexus" as when a "water . . . significantly affects the chemical, physical, *or* biological integrity" of a primary water (emphasis added)) *with Rapanos*, 547 U.S. at 780 (stating that waters must "significantly affect the chemical, physical, *and* biological integrity" of other waters). Some waters will meet the lower standard in the Final Rule without meeting the standard required by the Supreme Court and is hence not in accordance with law.

62.     The Final Rule thus includes a broad collection of waters within the definition of "waters of the United States" without sufficient evidence to show a continuous surface connection, continuous flows, permanence, or a significant nexus to primary waters. Such a definitional

interpretation of the Clean Water Act is in direct contravention of Supreme Court precedent and is thus arbitrary and capricious, an abuse of discretion, and not in accordance with law.

63.     Plaintiffs are entitled to a judgment declaring that the Final Rule is invalid and a permanent injunction against its enforcement.

## COUNT II

### (The Final Rule Violates the Commerce Clause)

64.     Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint.

65.     The Agencies' assertion of authority under the Clean Water Act has pushed the boundaries of Congress's constitutional authority before. *See SWANCC*, 531 U.S. at 172-74 ("There are significant constitutional questions raised by [the Agencies'] application of [its] regulations."); *Rapanos*, 547 U.S. at 738 (plurality opinion) ("The [Agencies'] interpretation stretches the outer limits of Congress's commerce power and raises difficult questions."). In this instance, the Final Rule exceeds Congress's constitutional authority.

66.     The Final Rule purports to regulate broad swathes of water in the United States, including through its broad definitions of adjacent waters, tributaries, and impoundments.

67.     Congress has only limited authority under the Commerce Clause—it can only "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3.

68.     The United States Supreme Court has noted that Congress has power over use of the "channels of interstate commerce," power to "regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce," and power over "activities having a substantial relation to interstate commerce," which means those that "substantially affect interstate

commerce." *United States v. Morrison*, 529 U.S. 598, 608–09 (2000) (citations and quotation marks omitted).

69.     The Final Rule would cover some waters—including small ditches and ponds not falling under exemptions—that do not involve interstate commerce at all. The Final Rule thus cannot be justified as regulating "channels of interstate commerce" because its breadth encompasses numerous waters that simply do not fit this descriptor.

70.     Additionally, because of the breadth of the Final Rule, most of those same waters that are not channels of interstate commerce have no use in interstate commerce and thus are not instrumentalities of interstate commerce, nor are they persons or things in interstate commerce that can be regulated or protected.

71.     Finally, because the covered waters lack a significant nexus to navigable interstate waters, those waters that are not channels or instrumentalities of interstate commerce also do not bear a "substantial relation" to interstate commerce, nor do they substantially affect interstate commerce.

72.     Because the Final Rule's interpretation of "waters of the United States" covers many waters that are not channels or instrumentalities of interstate commerce and which lack a substantial relation to interstate commerce, it exceeds federal authority under the Commerce Clause and is therefore unconstitutional.

73.     Plaintiff is entitled to a judgment declaring that the Final Rule is unconstitutional and a permanent injunction against its enforcement.

## COUNT III

### (The Final Rule exceeds the Agencies' authority under the Clean Water Act)

74.     Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint.

75.     The Administrative Procedure Act requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

76.     Congress made clear its policy regarding the scope of the Clean Water Act when it decided "to recognize, preserve, and protect the primary responsibilities and rights of States" in the regulation of water pollution. 33 U.S.C. § 1251(b).

77.     States have been the traditional, exclusive regulators of the majority of waters and wetlands within their borders. Because the States have direct experience with these waters and the stakeholders who live and work in and around them, the States are best-positioned to regulate them.

78.     Even if the Final Rule does not exceed Congress's Commerce Clause authority, it attempts to regulate to the limits of that constitutional authority. However, the Clean Water Act does not grant the Agencies the authority to regulate to the outer limits of the Commerce Clause. *SWANCC*, 531 U.S. at 172-74. Accordingly, the Final Rule is not in accordance with the Clean Water Act's text and policy goals.

79.     The Final Rule purports to regulate broad swathes of water in the United States. The Final Rule interprets "waters of the United States" to include all "[a]ll waters adjacent to" primary waters, impoundments, and tributaries, where "adjacent" is defined to include waters that lie within a "100-year floodplain" if also "within 1,500 feet of an ordinary high water mark." 40 C.F.R. § 230.3(s)(1)(vi), (3)(i)–(ii).

80.     The Final Rule additionally includes "all tributaries," which are defined to include waters that "contribute[] flow, either directly or through another water" to primary waters. 40 C.F.R. § 230.3(s)(1)(v), (3)(iii).

81.     The Final Rule includes on a case-by-case basis "similarly situated" waters that have a "significant nexus" to a primary water or significantly affect the chemical, physical, or biological integrity of a primary water. 40 C.F.R. § 230.3(s)(1)(viii).

82.     By interpreting "waters of the United States" to cover these intrastate waters, the Agencies "raise significant constitutional questions" about whether Congress could exercise authority over these more-isolated waters under the Commerce Clause. *SWANCC*, 531 U.S. at 173. These questions render the rule an attempt to "invoke[] the outer limits of  Congress' power," and because the Clean Water Act contains "nothing approaching a clear statement from Congress" that it intended the statute to reach the outer bounds of its constitutional authority, the Agencies' interpretation must be rejected. *Id.* at 172-74.

83.     The Final Rule, by attempting to arrogate power that Congress did not clearly grant, is an impermissible interpretation of the Clean Water Act and thus exceeds the Agencies' statutory authority and is not in accordance with law.

84.     Plaintiff is entitled to a judgment declaring that the Final Rule is invalid and a permanent injunction against its enforcement.

## COUNT IV

### (The Final Rule Violates the Tenth Amendment)

85.     Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint.

86.     The federal government can only exercise powers granted to it by the Constitution as limited by the provisions of the Constitution, including the Tenth Amendment. *New York v. United States*, 505 U.S. 144, 155 (1992).

87.     The Tenth Amendment provides that "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

88.     As the Supreme Court has recognized before, States have traditional and primary power over land and water use within their borders. *SWANCC*, 531 U.S. at 174.

89.     Recognizing these important principles, Congress respected the sovereign power of the States over water by "recognize[ing], preserv[ing], and protect[ing]  the primary responsibilities and rights of States" in the regulation of water pollution. 33 U.S.C. § 1251(b).

90.     By extending the Agencies' jurisdiction under the Clean Water Act to a broad swath of intrastate waters, in part through *per se* classifications of tributaries, adjacent waters, and impoundments of such waters that lack significant connections to federal interests, the Final Rule impinges on the traditional sovereign powers and the dignity of the States in violation of the Tenth Amendment.

91.     Under the Final Rule, numerous additional decisions may need to be made about certifications of water quality standards under the Clean Water Act and the possibility of federal oversight of permitting decisions. The Agencies will have arrogated to themselves additional power over the process as States seek to regulate waters that the federal government has no constitutional basis to regulate.

92.     Plaintiff is entitled to a judgment declaring that the Final Rule is unconstitutional and a permanent injunction against its enforcement.

## COUNT V

### (The Final Rule Violates the Administrative Procedure Act's
### Notice and Comment Procedures)

93.     Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint.

94.     Prior to a rulemaking, an agency must provide a "[g]eneral notice of proposed rule-making" and give "interested persons an opportunity to participate in the rule-making through submission of written data, views, or arguments." 5 U.S.C. § 553(b)-(c). A court must set aside any rulemaking made outside of these procedures. 5 U.S.C. § 706(1)(D).

95.     Proper procedure requires the final rule to be a "logical outgrowth" of the proposed rule. *See, e.g., Daimler Trucks North America LLC v. U.S. Protection Agency*, 737 F.3d 95, 100 (D.C. Cir. 2013).  When the final rule is not a logical outgrowth of the proposed rule, the final rule is invalid. *Id.*

96.     The Final Rule does not satisfy this requirement because parties were not given sufficient notice with respect to certain aspects of the "waters of the United States" definition. These include the definition of tributary, adjacent and neighboring waters, and also the inclusion of waters based on a case-by-case basis and the mechanisms by which the Agencies would establish jurisdiction over those waters.

97.     The definition of "tributary" has changed. The proposed rule required "the presence of a bed and banks and ordinary high water mark" and some flow that sometimes reaches a navigable water. 79 Fed. Reg. 22,269. The Final Rule expands that definition to include only the "presence of *physical indicators* of a bed and banks and ordinary high water mark," thereby eliminating the need for the presence of an *actual* bed, bank, or high water mark. 40 C.F.R. § 230.3(s)(3)(iii). Importantly, the Agencies assert that they can establish the presence of "physical indicators" by using certain tools such as remote sensing or mapping information that can establish the presence of a "tributary" even on lands where the evidence of flow cannot be seen. 80 Fed. Reg. 37,076-77. This aspect was not included in the proposed rule, and thus the public was not able to comment on the reliability of the processes that will be used.

98.     The "tributary" definition is not the only place the Agencies introduce the term "indicators" and associated technology for the first time in the Final Rule. The Agencies add that word in the Final Rule's description of what constitutes a "water:" "the agencies use the term 'water' and 'waters' in categorical reference to rivers, streams, ditches, wetlands, ponds, lakes, oxbows, and other types of natural or man-made aquatic systems identifiable by the water contained in these aquatic systems or by their chemical, physical, and biological *indicators*." 80 Fed. Reg. 37,055 (emphasis added). This is significant because if the Agencies can use "indicators" to say whether or not something is a "water," and something can be a "water" even when it has little or no evidence of actual water present, then the Agencies can potentially classify anything as a "water."

99.     The proposed rule defined "adjacency" and "neighboring" based on the location of waters within the riparian area or floodplain, or a hydrologic connection with a primary water, impoundment, or tributary.  79 Fed. Reg. 22,269.  In contrast, the Final Rule includes waters: (1) within 100 feet of a primary water, impoundment, or tributary; (2) within the 100 year floodplain and within 1,500 of the ordinary high water mark of a primary water, impoundment, or tributary; or (3) within 1,500 feet of the high tide line.  40 C.F.R. § 230.3(s)(1)(vi).

100.     The proposed rule included all waters on a case-by-case basis that have a significant nexus to a primary water.  79 Fed. Reg. 22,188, 22,269.  The Final Rule, on the other hand, includes waters within the 100 year floodplain of a primary water; within 4,000 feet of the high tide line or ordinary high water mark of a primary water, impoundment, or tributary; or within water type categories that have a significant nexus to a primary water.  40 C.F.R. § 230.3(s)(1)(viii).  The public was thus not given an opportunity to comment on inclusion of these waters within the Agencies' jurisdiction, or to examine the science behind the conclusions that waters within these distances would *per se* affect the chemical, physical, and biological integrity of a "water of the United States."

101.     Oklahoma is therefore entitled to relief under 5 U.S.C. § 702, 706(A), (C), (D).

**Prayer for Relief**

WHEREFORE, the State of Oklahoma prays the Court grant it the following relief:

A. A declaration that the Final Rule is arbitrary, capricious, an abuse of discretion, and not in accordance with law,

B. A declaration that pursuant to the APA the Final Rule is unconstitutional and void,

C. A declaration that the Agencies exceeded the authority granted to them under the Clean Water act in enacting the Final Rule and interpreting "waters of the United States" in such a manner that invades traditional, exclusive regulatory domains of the States without a clear statement from Congress,

D. A permanent injunction vacating the Final Rule and forbidding Defendants from prospectively enforcing the Final Rule in a manner inconsistent with the above-described declarations,

E. A judgment in favor of Plaintiff against Defendants for expenses of this litigation, including reasonable attorneys' fees and costs,

F. Grant Plaintiffs such further and additional relief as the Court deems just and proper.

Respectfully submitted,

<u>s/E. Scott Pruitt</u>
**E. SCOTT PRUITT, OBA#15828**
**Attorney General of Oklahoma**
**PATRICK R. WYRICK, OBA #21874**
**Solicitor General**
**P. CLAYTON EUBANKS, OBA # 16648**
**Deputy Solicitor General**
**SARAH A. GREENWALT, OBA #31566**
**Assistant Solicitor General**
**OKLAHOMA OFFICE OF THE ATTORNEY GENERAL**
313 NE 21st Street, OKC, OK 73105
(405) 522-3116; (405) 522-4534 (FAX)
Service email: fc.docket@oag.state.ok.us
Direct email: Patrick.Wyrick@oag.ok.gov
Clayton.Eubanks@oag.ok.gov
Sarah.Greenwalt@oag.ok.gov